UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 09-CIV-22274-HOEVELER

CSDS AIRCRAFT SALES
& LEASING, INC.,

   Plaintiff,

v.

LLOYD AEREO BOLIVIANO
AIRLINES,

   Defendant.

## ORDER DENYING DEFENDANT'S MOTION TO DISMISS

BEFORE the Court is the defendant Llyod Aereo Boliviano Airlines' motion to dismiss under Rule 12(b)(6) for the plaintiff's failure to state a claim for relief. The motion is fully briefed and ready for a decision. For the reasons that follow, the motion is denied.

### I. Background

The amended complaint tells the following story. The plaintiff, CSDS Aircraft Sales & Leasing, Inc., is a Delaware company in the business of buying and selling used aircraft around the world. CSDS's business model entails, (1) locating commercial aircraft that have fallen into disuse by their owners; (2) either buying or leasing the surplus aircraft, and making any necessary

repairs or refurbishments; and (3) re-selling or sub-leasing the planes to companies in need of aircraft. Am. Compl. ¶ 5. In the course of its business, CSDS also arranges for airplanes to be transported or ferried between international airfields, from sellers to buyers, and so forth.

In March 2008, CSDS learned of a 1996 Boeing 737-300 series aircraft that had been languishing for years in the Brazilian airfield of Llyod Aereo Boliviano Airlines ("LAB"), a major Bolivian airline company. None of LAB's pilots were licenced to fly the plane, and it needed about $2 million in repairs. Id. ¶ 6. So CSDS approached LAB about acquiring the Boeing 737-300; CSDS explained that it intended to make the plane airworthy then re-sell it to Lorena Air of Indonesia, which was in the market for just such an aircraft. Id. ¶ 10. On March 10, 2008, CSDS and LAB entered a lease-to-purchase agreement for the plane. CSDS agreed to make the $2 million in repairs and pay LAB $125,000 per month for forty-eight months, with an option to buy the aircraft at the end of the lease period for a balloon payment of $9 million.[1]

Two provisions of the 737-300 lease agreement are relevant to the present motion to dismiss. The first is LAB's obligation (which is actually framed as a "condition precedent" to CSDS's duty to

---

[1] Actually, the original March 10, 2008 contract was purely a lease agreement. The contract was amended the next day, on March 11, 2008, to include CSDS's purchase option. Both agreements are attached to the complaint as Exhibits A and B and, for the sake of simplicity, I will treat them as the same "lease agreement."

perform; more on that topic below) to "provide a letter of deregistration from the Civil Aviation Authority of Bolivia to obtain the FAA registration and the aircraft to operate a ferry flight for maintenance out of Brazil." See Ex. A ¶ 3.2.1. Not surprisingly, the parties dispute the meaning of this poorly-worded clause, and also whether LAB complied with it.

The second relevant provision is the indemnification clause in ¶ 6.1, under which CSDS will hold LAB harmless from any liability or obligation relating to the ownership, registration, exportation, disposition, etc., of the aircraft that may arise "after the Effective Time" of the contract. Under ¶ 1.1 of the contract: "'Effective Time' means the time and date at which the Aircraft is delivered by [LAB] to [CSDS], as such time and date are set forth in the Acceptance Certificate to be delivered by [CSDS]."

Also in March 2008, CSDS learned that LAB was in the market to purchase three Boeing 737-200 airplanes for use in operating its airline business (the 737-200 is a different series of plane from the 737-300). CSDS knew of a Minnesota-based airline company, Champion Air, which happened to own three Boeing 737-200, that it was willing to sell for $1 million each. CSDS bought the Minnesota planes outright and, in turn, agreed to lease them to LAB for $75,000 per month (per plane) for forty months, with ownership transferring to LAB at the expiration of the lease period. According to CSDS, it entered into *three* separate lease contracts

with LAB--one for each of the Minnesota planes--dated March 11, 2008.[2] CSDS alleges that it arranged for the three planes to be ferried to LAB's headquarters in Bolivia, with the costs of ferrying to be paid in advance by LAB.

Unfortunately, none of the four planes at issue reached its intended destination, and this three-count lawsuit ensued. In Count I, CSDS claims LAB breached the Boeing 737-300 contract "by failing to obtain a ferry permit for the First Aircraft, which would have allowed CSDS to ferry the aircraft to Malaysia and then on to Indonesia." Am. Compl ¶ 26. According to CSDS, "LAB was required to obtain a ferry permit from the United States [FAA] to fly the Aircraft to Kuala Lumpur, Malaysia for heavy maintenance." Id. ¶ 17. But what actually happened was that, CSDS "receiv[ed] what appeared to be a deregistration letter from LAB [and] submitted paperwork to the FAA to register the First Aircraft in the United States and sent an 'FAA DAR' to issue a ferry permit for the flight to Kuala Lumpur under the United States registration." Id. ¶ 18. CSDS undertook these steps to move the plane "based on LAB's representations that it had arrangement [sic] to allow Brazilian

---

[2] As Exhibit C to its amended complaint, CSDS attached one unsigned "copy of the form of lease agreement" that CSDS clams is a facsimile of the contracts used for each of the Minnesota planes. CSDS concedes that it "candidly has had a problem finding the executed copies of the lease agreements." LAB argues that CSDS's filing of a "single, unexecuted copy [of the lease agreement] establishes that LAB and CSDS did *not* enter into three separate contracts." CSDS is not, however, required to present a copy of all the lease agreements at this stage in the proceedings.

officials and Bolivian officials to allow [sic] the First Aircraft to be ferried to Malaysia." Am. Compl. ¶ 19. Unfortunately, once the 737-300 arrived in Malaysia "the aviation authority of Bolivia sent a letter to the FAA claiming [the plane] had been illegally moved to Malaysia with a false registration." Id. ¶ 21. This resulted in the cancellation of the ferry permit, and caused the plane to be stranded in Malaysia ever since. In Count I CSDS seeks compensatory damages and contractual attorney's fees.

In Count II, CSDS asserts a claim for breach of contract against LAB in relation to the three Minnesota aircrafts. CSDS alleges LAB breached the contracts by "failing to pay for the initial ferrying flight of the aircrafts to Bolivia and by otherwise failing to fulfill the terms of the lease agreements." Id. ¶ 37. CSDS seeks compensatory damages and contractual attorney's fees.

Finally, in Count III, CSDS asserts a claim against LAB for tortious interference with a business contract, *i.e.*, the lease contract between CSDS and Lorena Air for the Boeing 737-300. CSDS alleges LAB "intentionally and without justification interfered with CSDS's relationship with Lorena Air by not allowing the deregistration and ferrying" of the 737-300. Id. ¶ 45. The tortious interference allegedly caused CSDS to lose the $3 million it already sunk into repairing the aircraft, plus lost profits from the deal with Lorena Air. Id. ¶¶ 45-46.

## II. Legal standard

The purpose of a motion brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure is to test the facial sufficiency of a complaint. Rule 12(b)(6) permits dismissal of a complaint that fails to state a claim upon which relief can be granted. The Rule should be read alongside Rule 8(a)(2), which requires "a short and plain statement of the claim showing that the pleader is entitled to relief." Pursuant to Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), to survive a 12(b)(6) motion to dismiss, a complaint must contain factual allegations which are "enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true." A well-pleaded complaint will survive a motion to dismiss "even if it strikes a savvy judge that actual proof of these facts is improbable, and 'that a recovery is very remote and unlikely.'" Twombly, 550 U.S. at 556 (internal citation omitted).

## III. Analysis

### A. Count I

LAB advances several arguments in favor of dismissing CSDS's breach-of-contract claim pertaining to the Boeing 737-300 agreement. First, LAB argues that the premise of Count I--*i.e.*, that LAB had a duty to obtain the proper ferry permits--is contradicted by the terms of the written agreement governing the ferry permit, which are found in ¶ 3.2.1 of the contract. According

to LAB, ¶ 3.2.1 did not require LAB to obtain a ferry permit, but rather, only to provide a letter of deregistration from the Civil Aviation Authority of Bolivia (which CSDS would then use to achieve the FAA registration and the ferry flight). LAB points out that CSDS's own pleadings demonstrate that CSDS--and not LAB--was the party responsible for acquiring the actual ferry permit. See Am. Compl. ¶ 18 (alleging that, "CSDS submitted paperwork to the FAA to register" the Boeing 737-300).

However, there are two reasons CSDS's claim in Count I should not be dismissed. First, the language in ¶ 3.2.1 of the contract addressing which party is responsible for obtaining a ferry permit is unclear, to say the least. As a condition precedent to CSDS's performance, LAB is supposed to "provide a letter of deregistration from the Civil Aviation Authority of Bolivia to obtain the FAA registration and the aircraft to operate a ferry flight for maintenance out of Brazil."[3] According to CSDS's interpretation of ¶ 3.2.1, LAB was responsible for both *cancelling* the Bolivian registration, and *obtaining* the appropriate ferrying authorization. That interpretation of the contract will inevitably be challenged as the lawsuit proceeds. At this stage of the case, however, the Court is satisfied CSDS's theory about the ferrying permit is

---

[3] The lack of textual clarity is compounded by the fact that neither side has truly attempted to demystify ¶ 3.2.1 by, for example, explaining how the regulatory process of registering and deregistering planes relates to obtaining ferrying authorization.

plausible.[4]

Second, even if LAB was not responsible for obtaining the FAA registration and ferrying permit, it is undisputed that LAB was, at minimum, responsible for canceling the Bolivian registration and furnishing the letter of deregistration to CSDS. Somewhere in the administrative process of registering or deregistering the plane for transfer to Malaysia, something went undeniably wrong. One side or the other made a mistake; paperwork was not properly executed; Bolivian officials objected to the transfer. The Court has no information about whether the critical error was made by LAB (for example, by improperly cancelling the plane's Bolivia registration) or by CSDS (for example, by obtaining a ferrying permit based on false documents).[5] These issues need not be sorted out on a motion to dismiss because the standard is simply whether the plaintiff's breach-of-contract claim is plausible, not iron clad. Giving CSDS the benefit of factual inferences, the Court is satisfied CSDS has

---

[4] LAB's duties under ¶ 3.2.1 are framed as a "condition precedent" to CSDS's performance, which CSDS can waive "in its sole discretion." Thus, CSDS arguably waived LAB's failure to obtain a valid permit (if LAB was required to obtain a permit in the first place) when CSDS applied for the permit itself. But this cannot be decided on the present motion.

[5] Once again, because LAB's duties in ¶ 3.2.1 were a condition precedent to CSDS's performance and subject to CSDS's waiver, LAB argues that CSDS waived any obligations that ¶ 3.2.1 may have imposed. However, the Court is satisfied that if indeed LAB's failure to properly cancel the Bolivian registration caused this ordeal, its failure may give rise to a breach-of-contract cause of action since LAB allegedly represented it had complied with the condition precedent.

presented a plausible claim that LAB breached its duties pertaining to the transfer of the 737-300.

Alternatively, LAB argues that Count I should be dismissed based on the indemnity provision. LAB points out that under the terms of the indemnity clause, if LAB's breach occurred after the "Effective Time" of the contract (that is, after the time and date when LAB delivered the aircraft to CSDS), then CSDS has no claim. Once again, LAB may ultimately vindicate this defense to liability. But the applicability of the indemnification clause is a defense that LAB must prove. It has not met its burden merely by pointing out CSDS did not specifically allege in the complaint when the "Effective Time" occurred. Def.'s Mot. to Dismiss, p. 6, ECF No. 25.

B.  **Count II**

LAB argues that CSDS's claim that LAB breached the lease-to-purchase contracts for the three Minnesota planes should be dismissed because CSDS attached to the complaint (as Exhibit C) only an unsigned "form copy" of one of the three contracts at issue. Thus, LAB argues the unexecuted contract does not "demonstrate LAB's assent to any of its terms." However, LAB has not cited anything in the Federal Rules that requires CSDS to attach the contracts to the complaint. CSDS admits in its Court submissions it is presently trying to locate the executed documents. At this stage, CSDS need only present a set of factual allegations that, if true, could prove CSDS is entitled to relief.

CSDS has done that.[6] LAB's motion to dismiss the claim for attorney's fees in Count II is also denied.

C. Count III

Finally, LAB argues the tortious interference claim in Count III should be dismissed for the plaintiff's failure to state a claim for relief under Florida tort law. In Florida, a claim for tortious interference with a contractual relationship requires the plaintiff to prove: (1) the existence of a contract; (2) the defendant's knowledge of the contract; (3) the defendant's intentional procurement of the contract's breach; (4) the absence of any justification or privilege; and (5) damages resulting from the breach. See Johnson Enter. of Jacksonville, Inc. v. FPL Group, Inc., 162 F.3d 1290, 1321 (11th Cir. 1998). The requirements for the tort of "interference with a business relationship" are similar, except that a plaintiff need not establish the existence of a contract; he or she need only show the existence of a business relationship. Salit v. Ruden McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 385 (Fla. 4th DCA 1999). Although Count III is labeled "Tortious Interference with Lorena Air Agreement," some language in Count III suggests the plaintiff is actually proceeding

---

[6] LAB also draws attention to one of the contractual conditions precedent to its duty to perform under the contract: namely, that CSDS "shall have executed and tendered to [LAB] [the] agreement." Am. Compl., Exhibit C, ¶ 3.2.1. However, there is no suggestion, let alone proof, that CSDS did not *at one point* execute the agreement and tender it to LAB, as required.

under a theory that LAB interfered with a business "relationship" rather than a "contract." CSDS has not clarified its tort theory because, according to CSDS, Count III is actually governed by foreign law; it urges that: "[t]here is no basis for applying Florida law to LAB's interference in the contract between Lorena Air and CSDS [because] [t]he Lorena Air contract did not include LAB as a party, was not performed or entered in Florida, and the interference did not occur in Florida." Pl.'s Opp. to Mot. to Dismiss, p. 6, ECF No. 28. In a diversity case, however, a federal court generally applies the substantive law of the forum state, unless there is a reason not to. CSDS has not cited any authority for its "foreign law" argument and, oddly, has not even suggested which foreign law should apply. Of course, the Court must apply *some* law. Although CSDS seems to believe the law of an unspecified, non-Florida jurisdiction applies, in the absence of any suggestion which jurisdiction that is, the Court will rely on Florida law.

Regardless of whether a defendant interferes with a contractual relationship or a business relationship, either way the defendant must be a third party or a stranger to the business relationship to be liable for interference, see Salit, 742 So. 2d at 386, and "a cause of action for tortious interference cannot exist against one who is himself a party to the contract." Montgomery & Larmoyeux v. Philip Morris, Inc., 992 F. Supp. 1372, 1375 (S.D. Fla. 1998); See also Special Purpose Accounts Receivable Cooperative Corp. v. Prime One Capital Co., LLC, 125 F. Supp. 2d

1093, 1103 (S.D. Fla. 2000); <u>Salit</u>, 742 So. 2d at 385. The so-called "privilege to interfere" protects certain parties with a legally-recognized interest in a contract from being sued for interfering with that contract. See <u>Salit</u>, 742 So. 2d at 386. The privilege is not unlimited, however, and it does not afford an absolute shield to liability. <u>Burger King Corp. v. Ashland Equities, Inc.</u>, 161 F. Supp. 2d 1331, 1336 (S.D. Fla. 2001). Thus, even for "non-strangers" to a contract, the privilege to interfere is a valid defense only to the extent the interference was done in good faith. See <u>Morsani v. Major League Baseball</u>, 663 So. 2d 653, 657 (Fla. 2d DCA 1995). In other words, parties are disqualified from asserting the privilege if they act maliciously or with conspiratorial motives, see <u>Morsani</u>, 663 So. 2d at 657, because "the privilege does not encompass the purposeful causing of a breach of contract." See <u>Making Ends Meet, Inc. v. Cusick</u>, 719 So. 2d 926, 928 (Fla. 3d DCA 1998) (quoting <u>McCurdy v. Collis</u>, 508 So.2d 380, 384 (Fla. 1st DCA 1987)).

Although LAB asserts a "privilege to interfere" with the CSDS-Lorena Air contract, and therefore argues Count III should be dismissed, the Court is not satisfied immunity is warranted. First, LAB was not a party to the lease agreement between CSDS and Lorena Air; second, so far as it appears, LAB had no legitimate privilege to interfere with that contract. Although LAB may have been the source of CSDS's business opportunity with Lorena Air (since LAB owned the Boeing 737-300), LAB would still be exposed to tort

liability if LAB intentionally and without justification caused the breach of the Lorena Air contract.[7] Accordingly, it is hereby:

**ORDERED AND ADJUDGED:** The defendant's Rule 12(b)(6) motion to dismiss the complaint is denied.

**DONE AND ORDERED** in Miami, Florida, April 20, 2011.

*/s/ WM Hoeveler*
WILLIAM M. HOEVELER
SENIOR UNITED STATES DISTRICT JUDGE

---

[7] The crux of this lawsuit is the breach-of-contract claim. The tortious interference claim seems to be redundant (since LAB's only alleged "tortious interference" is its failure to facilitate the ferry permit--which is also the basis for the contract claim in Count I), and somewhat doubtful in fact. Nevertheless, the Court finds that Count III is supported with enough factual allegations to pass Rule 12(b)(6) scrutiny.